## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00054 (TSC)** |
| **v.** | : | |
| | : | |
| **MATTHEW MAZZOCCO,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Mazzocco to three months of home confinement, a probationary term of three years, no less than 60 hours of community service, and $500 in restitution.

### I.    Introduction

The defendant, Matthew Mazzocco, participated in the January 6, 2021 attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage. The defendant stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, the government is requesting a period of home confinement along with a probationary sentence in this case based on the fact that: (1) although the defendant admonished other rioters to not damage any property he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in front of rioters forcing their way into the Capitol; (2) the defendant remained inside the Capitol for a brief period of time – approximately 12 minutes – yet  made his way into both the Crypt and the Spouse's Lounge; (3) the defendant timely admitted to his actions and accepted responsibility; (4) although the defendant had limited social media activity regarding the event, his comment on Facebook indicated that he understood and concurred with the disruption of the Congressional proceedings; (5) the defendant's expressions of contrition are belied by text messages sent to family and friends shortly after the event; and (6) the defendant does not have a criminal history.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* Statement of Offense (ECF No. 23) at pp. 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent –contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Matthew Mazzocco's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Matthew Mazzocco flew to Washington, D.C. from his home in Texas. The next day, he attended the "Stop the Steal" rally on the Ellipse.  Arguably, the defendant was aware of the potential for violence on January 6.  Found within in his cell phone was a screen shot

advertising the January 6 rally, which included a Twitter post from former-President Trump explicitly alleging election fraud and that he had won the election. The post went on to promise that the rally would be "wild."



The defendant attended the rally, equipped with a body-worn camera, and afterwards walked to the Capitol building.

Based on photographs in his cell phone, the defendant appears to have walked around the outside of the Capitol building, photographing the growing crowd on both the east and west side of the building, including those who were scaling the walls of the Capitol.



Thus, there is no doubt that the defendant was aware of the escalating violence and disorder around him.   Indeed, he took a selfie-style photograph of himself outside of what appears to the East Rotunda Door, which, as the name indicates, is on the east side of the building on the second floor. At the time he took the selfie, a large crowd had assembled at the doors and was forcing its way inside.



The government currently does not have evidence that the defendant participated in attempts to breach the door.[1]

---

[1]      The East Rotunda door was breached at approximately 2:25 p.m., with the help of other rioters who were already inside the building.  However, rioters began breaking the glass of these doors at around 2:20 p.m.  The metadata for the defendant's selfie-photograph at this door indicates that it was taken and/or saved to his phone at approximately 2:46 p.m. on January 6, 2021.  Indeed, a careful viewing of this photograph shows that this door was open at that time the defendant took this photo.

The defendant seemingly walked to the opposite side of the Capitol building after taking this selfie-photograph, as he entered the building through the Senate Wing Door, located on the first-floor west side of the building, at 3:10 p.m., after the first rioters breached that door.



Upon entering the building, the defendant immediately walked to two police officers in riot gear, visible at the bottom of the above photograph, and gave one of them a fist-bump. Presumably recording with his body-worn camera, the defendant walked to the Senate side of the building.

Open-source video footage captured the defendant inside a conference room area that is known as the Spouse's Lounge. He was initially captured with his back to the camera, however the video later recorded Mr. Mazzocco's face as he was exiting the room.



At the beginning of the video, several individuals can be seen looking out of a window; visible through the window is the back of the police line that formed in an attempt to stem the continuing breach of the Capitol building. While in the Spouse's Lounge, the individual recording the video received information that "people were on the Senate floor," and repeated that information to those in the room. The defendant was within apparent earshot of that statement. A few moments later, while still inside the Spouse's Lounge, the defendant warned others not to take or destroy anything and stated that they were probably going to get in trouble for what they were doing.

6

United States Capitol surveillance video captured the defendant in the Crypt of the building at about 3:17 p.m.  The defendant paused there to take another selfie-style photograph with the bust of Abraham Lincoln.



At approximately. 3:24 p.m., the defendant left the Capitol building through the same door he had entered.



The defendant also posted about the events of January 6 on social media.  That very day he posted a photograph to Facebook with the caption "The capital is ours!"



By the next day, the defendant's Facebook post had gained notoriety and was widely shared amongst social media users. Indeed, the defendant's Facebook post was provided to the FBI by a concerned citizen on January 7, 2021. Based on text messages he exchanged at approximately 9:50 p.m. CST on January 7, 2021, the defendant was aware of the negative reaction to his Facebook post and already had deleted it. The government's investigation revealed that his entire social media presence followed soon thereafter.

The defendant returned to Texas from Washington, D.C. on January 7, 2021. When he was arrested ten days later, agents asked the defendant for his body-worn camera. He claimed that he did not know where it was. A search of his residence did not uncover the camera.

The defendant exchanged text messages with friends and family in which he claimed that the events of January 6 were not a riot, that he was simply protesting a fraudulent (in his mind) election, and that "antifa" was to blame for the violence. During the evening of January 6, 2021, an associate advised the defendant to delete his Facebook account because he was in "hot water."

The defendant responded that the Capitol "belonged to us," that he believed there was "foul play" in the election, and that he showed up at the Capitol to protest and to "let his voice be heard."  He concluded that there was "NOTHING wrong with that" (emphasis in original).

On January 8, 2021, the defendant received a text from an associate who stated they had many friends who attended the "Trump rally"; the defendant replied, "that was not a riot."





He followed this message with an innocuous photograph of a smiling woman holding an American flag seemingly inside the Capitol, as if to prove that it was "not a riot."



On that same day, Mr. Mazzocco told two individuals via text message that "I guarantee you the people who actually stormed the capital were antifa plants."



In another message exchange, on January 16, 2021, in response to an individual sending him a news article with the headline "Federal prosecutors walk back sensational allegation of plot to kill lawmakers during Capitol siege," the defendant wrote, "Yupppp," and "The more they discover it was antifa the more they're backing up." Thus, ten days later the defendant was still blaming "antifa" for the violence on January 6.

*The Charges and Plea Agreement*

On January 17, 2021, Matthew Mazzocco was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). He was arrested on the same date at his home in Texas. On January 28, 2021, Matthew Mazzocco was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 2, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, the defendant agreed to pay $500 in restitution to the Department of the Treasury.

## III.     Statutory Penalties

The defendant now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months

of imprisonment and a fine of up to $5,000.[2]   As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  § 3553(a)(6).  We now turn to these factors.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.  So, too, does the conviction this defendant now faces.  Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 is drastically different than picketing or demonstrating at the Capitol some other day, without other rioters present.

While each defendant should be sentenced based on their individual conduct, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances.  As a person entered the Capitol, they would – at a minimum – have

---

[2]     Because Mr. Mazzocco has pled guilty to a petty offense, a term of supervised release is not authorized.  *See* 18 U.S.C. § 3583(b)(3)

crossed through numerous barriers and barricades and heard the throes of the mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with or ignored law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Prior to entering the Capitol, the defendant seemingly walked around the building, observing the mayhem and disorder on both the east and west side of the building. As if documenting a vacation, he paused several times to photograph the growing crowd and the increasing chaos, snapping pictures of people scaling the Capitol building walls. He took a smirking photograph of himself with rioters breaching the Capitol doors in the background. Armed with these observations outside the Capitol, he still chose to enter the building. The defendant then travelled to a few different locations inside the Capitol, to include the Crypt and the Spouse's Lounge. There is no evidence that he entered either the Senate or the House Chamber, although

he was within earshot of other rioters discussing that there were people on the Senate floor, and he did not immediately leave the building. Ultimately, after about 12 minutes inside the building, the defendant left through the same door through which he entered, amidst a much larger police presence.

The government currently has no evidence that Matthew Mazzocco engaged in any violence or destruction of property at the Capitol. Indeed, there is evidence that he warned other rioters not to take or damage anything. He entered the building approximately forty minutes after other rioters first breached the Senate Wing Door. By the time he entered, the doors were open and police officers stood in the hallway as a steady stream of rioters crowded the opening. And yet, there were clear signs of damage. The door through which he entered had its windows smashed in and rioters were climbing through the broken windows on either side of the door to enter the building.

Initially, according to a tip received by the FBI, Mr. Mazzocco had posted to Facebook multiple photographs of himself inside the Capitol. However, after the negative publicity that his post received, and upon recognizing that there could be legal consequences, the defendant deleted the post, and shortly thereafter, his Facebook account entirely. Additionally, despite his arrest occurring only eleven days after January 6, the defendant claimed that he did not know the whereabouts of his body camera. A search of his residence on the same day did not yield this important piece of evidence the defendant seemingly used to document his time inside the Capitol.

While the nature and circumstances of the offense supports a sentence of incarceration, for misdemeanor defendants who, like Matthew Mazzocco, committed few of the non-exclusive factors listed above, the government is more likely to recommend a more lenient sentence.

### B. The History and Characteristics of the Defendant

As set forth in the Presentence Investigation Report, the defendant has no criminal history. ECF No. 25 ¶¶ 23-24.  He is and has been steadily employed as a mortgage broker.  The defendant appears to have strong familial support – he is married, with a daughter and a stepson, and is maintains an emotionally supportive relationship with his parents.  Based on a review of the defendant's cell phone contents and other investigative steps, the Government currently is not aware of the defendant having an association with extremist groups, promoting violence, or engaging in any other criminal conduct.  The defendant has been fully compliant with his pre-trial conditions of release and was cooperative with law enforcement at the time of and since his arrest.

Despite the chaos that the defendant observed inside and outside the Capitol – and which he took the time to photograph – he expressed to family and friends in text messages shortly after that January 6 was "not a riot," that he was simply protesting a fraudulent (in his mind) election, and that the group "antifa" was responsible for the violence of the day.  More recently he has expressed remorse for his own actions.  *See* Presentence Investigation Report (ECF No. 25) ¶¶ 19 - 20.  Whether the defendant is truly remorseful for his actions or is simply remorseful that he has been held accountable is debatable.  Notably, the defendant expressed an interest in pleading guilty at the outset of the case and he was one of the first defendants to plead guilty in connection with the events of January 6.  When recommending an appropriate sentence, the government gives significant weight to the defendant's early resolution of this case.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[3]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected.") (statement of J. Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that

---

[3]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification.  It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

The gravity of these offenses demand deterrence.  This was not a protest.  *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").  And it is important to convey to future rioters and would-be mob participants – especially those who intend to improperly influence the democratic process – that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

On one hand, the defendant's behavior and words on January 6 highlight the need for deterrence.  His decision to fly across the country to attend a rally that promised to be "wild" was of questionable wisdom.  And he clearly knew that his presence inside the Capitol was wrong when he said as much, stating that they were all probably going to get in trouble for what they were doing.  Even more troubling, however, was the defendant's casual appreciation for the mayhem surrounding around him, such that he posed for a selfie in front of a group forcing their way into the Capitol.  This is compounded by his statement on Facebook that the Capitol is "ours," a sentiment that certainly shows Mr. Mazzocco understood and concurred with the attack on the Capitol in the name of preventing the peaceful transfer of power.

On the other hand, as discussed above, Mr. Mazzocco warned others not to take or break any property.  Additionally, the defendant's early acceptance of responsibility does show an

16

important level of contrition for his behavior on January 6. In short, the question of deterrence, here, is multi-faceted. The demands of general deterrence favor incarceration, but the need for specific deterrence may be met with a less severe sentence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy, to corruptly interfering with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6 were not minor crimes. A probationary sentence should not necessarily become the default. Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 21-cr-00164 (RCL), Tr. at 19; *see also United States v. Valerie Ehrke*, 21-cr-00097 (PFF), Tr. at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of J. Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of

institutional incarceration.  While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement.  After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the latter category.  At this time, no unwarranted sentencing disparities exist, nor does the government's request create one.

## V.     Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Matthew Mazzocco to a period of three months of home confinement, a probationary period of three years, no less than 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Matthew Mazzocco's liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.  It also allows continued monitoring of Mr. Mazzocco in the event of future participation in similar conduct.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:     /s/ *Kimberley C. Nielsen*
KIMBERLY C. NIELSEN
Assistant United States Attorney
N.Y. Bar No. 4034138
555 4th Street, N.W., Room 9913
Washington, D.C. 20530
Phone: 202-252-7418
Email:  Kimberley.Nielsen@usdoj.gov