```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


 UNITED STATES OF AMERICA,      .
                                .
          Plaintiff,            .  CR No. 21-0054 (TSC)
                                .
      v.                        .
                                .
 MATTHEW CARL MAZZOCCO,         .  Washington, D.C.
                                .  Monday, October 4, 2021
          Defendant.           .  10:05 a.m.
 . . . . . . . . . . . . . . . . .
```

```
                    TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE TANYA S. CHUTKAN
                  UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

```
For the Government:          KIMBERLEY C. NIELSEN, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street NW
                             Washington, DC 20530
                             (202) 252-7566


For the Defendant:           ROBBIE L. WARD, ESQ.
                             530 Lexington Avenue
                             San Antonio, TX 78215
                             (210) 758-2200


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription

```
 1                    P R O C E E D I N G S

 2                    (Via Videoconference)

 3            THE DEPUTY CLERK:  Your Honor, we have Criminal

 4    Action 21-54, United States of America versus Matthew Mazzocco.

 5    We have Ms. Kimberley Nielsen representing the government,

 6    we have Ms. Robbie Ward representing Mr. Mazzocco, we have

 7    Mr. John Copes representing Pretrial Services appearing by

 8    telephone, and we also have Ms. Kelli Willett representing

 9    Probation appearing by video.  In other words, all parties

10    are appearing by video with the exception of the Pretrial

11    Services officer.

12            THE COURT:  All right.  Good morning, everyone.

13       Mr. Mazzocco, can you hear me, and Ms. Ward?

14            THE DEFENDANT:  Yes, Your Honor.

15            MS. WARD:  Yes, Your Honor.

16            THE COURT:  All right.  And, Mr. Copes, thank

17    you for being here.  I didn't get a Pretrial Services report,

18    but I assume the defendant is in compliance with his release?

19            PRETRIAL OFFICER:  Yes, Your Honor.

20            THE COURT:  Mr. Copes, I know you're very, very busy,

21    so if you need to get off, I won't require you to stay for the

22    remainder of this hearing unless you want to.  But thank you for

23    being on this call this morning.

24            PRETRIAL OFFICER:  Thank you, Your Honor.

25            THE COURT:  Before we go any further, let me just
```

ask the parties if they have any objection to proceeding by videoconference pursuant to the CARES Act given the current global pandemic.  Ms. Ward?

MS. WARD:  No objection, Your Honor.

THE COURT:  Ms. Nielsen?

MS. NIELSEN:  No objection, Your Honor.

THE COURT:  All right.  So we are here this morning for the sentencing of the defendant, Matthew Carl Mazzocco, who has pleaded guilty to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40 § 5104(e)(2)(G) of United States Code.

Ms. Ward, am I pronouncing your client's name right? Is it Mazzocco?

THE DEFENDANT:  Yes.

MS. WARD:  Yes, Your Honor.

THE COURT:  All right.  Just a reminder to anyone who is participating or calling in to this hearing, it is strictly prohibited by federal and local court rules to record any portion of the proceeding or to take screenshots or any other photographs of the proceedings.  So no recording, no photographs.  There's a transcript.  You can order the transcript if you need.

All right.  So in preparation for the sentencing today, I've received and reviewed the presentence report and sentencing recommendation from the probation department and the following

1    documents that were submitted by counsel in advance of

2    the hearing:  I've reviewed the plea agreement signed by

3    Mr. Mazzocco -- Oh.  One question.  I noticed in the defendant's

4    memorandum in aid of sentencing, why was that filed under seal?

5            MS. WARD:  Your Honor, we attached several letters.

6    And throughout the course of this, although -- like you just

7    mentioned, nothing should be recorded and all of that, during

8    his initial appearance, unfortunately, the media did not listen

9    and took a picture of him.

10           THE COURT:  Was the photograph taken during a hearing?

11           MS. WARD:  Yes.  During his federal initial appearance

12   in front of a magistrate.

13           THE COURT:  Did you report that to the magistrate

14   judge?

15           MS. WARD:  I did, and he contacted that reporter.

16   But, unfortunately, someone else picked it up, and someone

17   else picked it up.  And now if you -- you can still find it

18   online, frankly.

19           THE COURT:  Well, Ms. Ward, you didn't file a motion

20   to file these documents under seal.  There's a presumption that

21   all documents filed on the public court docket are public, and

22   there has to be a motion to file a document under seal.  I don't

23   recall receiving a motion.

24           MS. WARD:  We did get permission.  We talked to Mr.

25   -- my assistant, I think, to Mr. Bradley, and he said we had

1    to get -- maybe we thought that it was with Ms. Nielsen.

2              THE COURT:  Okay.  Mr. Bradley's sitting here shaking

3    his head.  Mr. Bradley can't give permission.  Documents are

4    filed under seal only after I grant permission for them to be

5    filed under seal.  The government did not file its sentencing

6    memorandum under seal.  These cases are a public record.

7         There may be information in the letters that is sensitive

8    and confidential or pertains to matters of a health nature, but

9    you can't seal documents without the permission of the Court and

10   without showing good reason to have them sealed.  There's a

11   presumption of documents being open to the public.  They're

12   on public record.

13        And not only did you file under seal the supporting

14   letters, you filed under seal your own sentencing memorandum,

15   and I'm going to unseal those documents and order you, if you

16   want to file them under seal, to file a motion.  I won't unseal

17   the letters.

18             MS. WARD:  Okay.

19             THE COURT:  I'm unsealing the sentencing memorandum,

20   and if you want anything in that memorandum redacted, or if you

21   want -- and I'm going to give you a week to file a motion to

22   file those supporting letters under seal and provide me with

23   redacted versions of the letters that can go on the public

24   docket.  There's a way we do things.  If you file a motion, file

25   it under seal, you have to file on the public record redacted

1    versions of the document.  None of that has been done.

2         But I'm not placing your entire sentencing package

3    under seal.  The public has a right to access these documents,

4    especially in these cases.  The government's sentencing

5    memorandum is not filed under seal, and there's nothing in

6    your sentencing memorandum that warrants sealing under the

7    criteria that I apply for sealing.  So I'm going to unseal

8    that sentencing memorandum.

9              MS. WARD:  And I'll file the redacted one, Your Honor.

10             THE COURT:  Well, and you have to file a motion

11   for whatever you're seeking to seal, and you have to get the

12   government -- you know, you have to say whether that motion is

13   opposed or unopposed.  So you need to meet and confer with the

14   government to see if they have any objection, and you need to

15   provide me with a redacted version of whatever document you seek

16   to seal that can go on the public record.  That is how we do

17   things here.  And it has to be with permission of the Court.

18        All right.  So I've reviewed and received the following

19   documents: the plea agreement signed by Mr. Mazzocco, the

20   statement of offense signed by Mr. Mazzocco, the government's

21   sentencing memorandum, Mr. Mazzocco's sentencing memorandum,

22   and appended to his sentencing memorandum a number of letters

23   of support for Mr. Mazzocco including from his family members

24   and friends, community members, clergy and so on.

25        I'm not going to give the names of all of those individuals,

1  because Ms. Ward indicates she may be filing a motion to seal,

2  but suffice it to say that a large number of Mr. Mazzocco's

3  friends and family members and neighbors and clergy have written

4  letters in support of him, and I've read them all.

5      So let me first begin with the presentence report.  The

6  final presentence report and sentencing recommendation were

7  filed -- I'm sorry.

8      (Deputy Clerk conferring with the Court.)

9      We're having a problem with the public line, so we need to

10  reconnect it.  Just give me a moment.

11      (Pause.)

12          THE COURT:  Okay.  All right.  We are back on the

13  record, and it seems that our technological problems have been

14  dealt with.  So let me first begin with the presentence report.

15  The final presentence report and sentencing recommendation were

16  filed on September 20 of this year.  I looked at the report, and

17  it doesn't appear that there are any objections, but just let me

18  ask you for the record, Ms. Nielsen, does the government have

19  any objection to any of the factual determinations set forth

20  in the presentence report?

21          MS. NIELSEN:  We do not, Your Honor.  No.

22          THE COURT:  And I assume you are not expecting

23  an evidentiary hearing or any witnesses today; right?

24          MS. NIELSEN:  That is correct, Your Honor.

25          THE COURT:  Okay.  Mr. Mazzocco, are you fully

1  satisfied with the services of your attorney, Ms. Ward, in

2  this case?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Do you feel that you've had enough time

5  to talk to her about the probation department's presentence

6  report and the papers that were filed by the government in

7  connection with the sentencing?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Ms. Ward, have you and Mr. Mazzocco read

10 and discussed this presentence report?

11           MS. WARD:  We have, Your Honor.

12           THE COURT:  Are there any disputed issues of fact;

13 that is, does Mr. Mazzocco have any objection to any of the

14 factual allegations set forth in the presentence report?

15           MS. WARD:  No, Your Honor.

16           THE COURT:  All right.  Hearing no objections from

17 either side, I will accept the factual recitations in the

18 presentence report regarding the circumstances of this offense;

19 and, therefore, the facts as stated in the report will be my

20 findings of fact for the purposes of this sentencing.

21     All right.  Now, Mr. Mazzocco, because you've pleaded

22 guilty to a misdemeanor offense, the United States Sentencing

23 Guidelines do not apply to your case.  The presentence report

24 lays out the probation office's calculation of the appropriate

25 sentencing range that applies in this case based upon the

1    relevant statutory factors.

2         Based on the sentencing factors under 18 U.S.C. § 3553(a)

3    which I must consider, which we all must consider in every

4    sentencing, the presentence report recommends a sentence of

5    18 months' probation, $500 of restitution, and a $10 special

6    assessment.

7         Now, Section 3553 does require me to consider a variety

8    of factors including the applicable penal statutes.  The charge

9    of Parading, Demonstrating, or Picketing in a Capitol Building,

10   in violation of 40 U.S.C. § 5104(e)(2)(G), carries a statutory

11   maximum penalty of six months' imprisonment.

12        Because Mr. Mazzocco has pled guilty to a petty offense,

13   the statutes do not authorize a term of supervised release.

14   The statute of conviction sets a maximum fine of up to $5,000,

15   a special assessment of $10 is mandatory, and the statutory

16   restitution provisions are applicable because there is an

17   identified victim.

18        Pursuant to 18 U.S.C. § 3663(a) and the plea agreement,

19   Mr. Mazzocco has agreed to pay $500 in restitution to the Clerk

20   of the Court for disbursement to the Architect of the Capitol.

21        Counsel, have I stated accurately the statutory framework

22   under which we're operating here?  Ms. Ward?

23             MS. WARD:  Yes, Your Honor.

24             THE COURT:  Ms. Nielsen.

25             MS. NIELSEN:  Yes, Your Honor.

1      THE COURT:  And I've already notified the parties

2 of the particular sentence that the probation officer has

3 recommended, which is 18 months in prison [sic], $500 in

4 restitution, and a special assessment of $10.

5      The recommendation of the probation office is not based on

6 any facts or circumstances that have not already been revealed

7 to the parties in the presentence report.

8      MS. NIELSEN:  I'm sorry, Your Honor, to interrupt.

9 But the presentence report actually recommended 18 months of

10 probation, not --

11      THE COURT:  I'm sorry.  I thought I said that.

12 sorry.  Eighteen months of probation.  Yes.  All right.

13 Give me one moment, please.

14      Okay.  At this point I'd like to give the parties an

15 opportunity to address the Court.

16      Ms. Nielsen, it's my understanding that the government

17 is recommending three months of home detention.  This is your

18 opportunity to allocute on behalf of the government.

19      MS. NIELSEN:  Thank you, Your Honor.  Yes.  That's

20 correct.  The government is asking the Court to sentence

21 Mr. Mazzocco to three months of home confinement, three years

22 of probation, no less than 60 hours of community service, and

23 the agreed-upon $500 in restitution payable to the Architect of

24 the Capitol for the damage that was done to the building as a

25 result of January 6.

1     As this Court has noted, the factors the Court should
2 consider are under 18 U.S.C. 3553, and as we noted in our memo,
3 these factors in our opinion, and we would submit to the Court,
4 provide mixed guidance with respect to Mr. Mazzocco.  We would
5 argue that some favor incarceration; others require or indicate
6 a more lenient sentence is appropriate.

7     I want to start first with the first factor, the
8 seriousness of this offense, the need to promote respect for
9 the law, and to provide for just punishment in this case.
10 And frankly, Your Honor, I would argue to the Court that in
11 any case associated with the January 6th riot, incarceration
12 is appropriate.

13     This defendant did plead guilty to misdemeanor statute,
14 and that statute is usually reserved to prosecute single
15 protesters or small groups who briefly disrupt Congress, like
16 holding up signs or shouting during a session from the gallery,
17 and then those individuals are removed from the proceeding.

18     This is not that case.  The January 6th riots were not a
19 minor crime, and they were not a single incident.  As the Court
20 knows, this conduct here from January 6 is not just a difference
21 in the numbers of people that were there on January 6, but also
22 a difference in the intent that was there and the kind of
23 conduct that occurred.

24     Your Honor, I would submit to the Court, it is difficult
25 to fathom a more serious offense to this community, to the

District of Columbia, to the country, and to the very fabric
of American democracy than the one that was posed by those who
knowingly and eagerly engaged in an insurrection and occupied
the United States Capitol in order to abort certification of a
lawful and fair election.

Every person who was present without authority in the
Capitol on January 6 contributed to the chaos of that day
and the danger posed to law enforcement, the United States
Vice President, members of Congress, and generally the peaceful
transfer of power in our country.  No rioter acted in a vacuum.
The collective action of each and every rioter contributed to
the property damage, the injury, the destruction, and the fear
that law enforcement, members Congress and their staff
experienced that day.

Each person who entered the Capitol building made it that
much harder for police to regain control of different parts of
the building, to keep members of Congress and their staffs safe,
and ultimately, Your Honor, to regain control of the exterior
of the Capitol, which, as Your Honor knows, was subject to an
incredible level of violence that day.

For these reasons, it is our position that probation as a
default, as the norm, even for these misdemeanor cases, runs
the risk of undervaluing the seriousness of the offenses.  And
rather than underscoring the need to promote respect for the
law and our constitutional protections, if probation becomes

1    the norm, we risk projecting the idea that what happened on

2    January 6 was not that big of a deal, that the rioters really

3    were just unruly tourists, and to that extent, punitive

4    measures, including incarceration, for these rioters is

5    necessary to promote the goals of this sentencing factor.

6        The second factor, general deterrence.  We would argue

7    that the second factor, general deterrence, punitive measures

8    also apply to that factor.  Of course, Your Honor, we don't

9    want to deter true protest.  We're not talking about deterring

10   individuals from picketing or marching or any other First

11   Amendment-protected activity.  We're talking about deterring

12   the next discontented group from violently descending onto the

13   Capitol, en masse, the next time that the Congress, for example,

14   meets to certify the results of our next election.

15       Punitive measures are also important for general deterrence

16   where you have a crime like this one that was not just public;

17   it was globally observed.  This was a crime that literally

18   played out before the eyes of the world.  And it was not just

19   because of the presence of the news media who broadcast the

20   events of January 6 into our homes.  It was the rioters

21   themselves.  They took pictures of themselves, of others

22   breaching the Capitol, live-recording the events and uploading

23   those crimes in real time, or shortly thereafter, to the

24   internet and social media.

25       I would also note, importantly, for the idea of

general deterrence, Your Honor, that for the vast majority
of the people on January 6, they were able to walk away from
their crimes that day and go home.  The idea of punitive
measures for general deterrence is important here.  To make
sure that everyone does recognize that there are consequences
of the actions of January 6, it's vital to deter this kind
of conduct in the future.

As we mentioned in our memo, several judges on this
court have stated that probation should not be the default
in these misdemeanor cases.  And in light of the factors that
I've just laid out, I would submit that it is important for
the general public to know that probation is not the default
for January 6 cases, and I would encourage this Court to
adopt that same view of these cases.

Turning to the third factor, which is the nature and
circumstances of this particular offense, Your Honor, and
that's a more nuanced question in the government's position.
Mr. Mazzocco was in the Capitol for only 12 minutes, and he
did tell others, don't take or break anything, noting that
they would probably get in trouble for what they did.  And
that is certainly a positive for Mr. Mazzocco.

However, our investigation also shows that he took
the time to walk around the outside of that Capitol building
before he entered.  He observed and documented, photographing
the rioters scaling the walls of our building, an image which

has become something that has been shown world over and is kind of emblematic of what we saw that day.  He documented rioters forcing their way into the building through that famous East Rotunda door and took a selfie in front of it, and then he still chose to enter the building.

Once inside, he would have seen the damage to the windows next to the doors that he entered.  He would have seen other rioters climbing through those windows.  He would have seen the hallways where he entered overrun with a sea of people, and he would have heard comments about people being on the senate floor.  And yet he still did not leave.  And then after that, finally, when he did take time to walk out of the Capitol, he posted a photo of himself in front of the building with the caption "The capital is ours!"

I would will submit, Your Honor, that comment could only mean one thing:  The defendant knew exactly what he was doing when he was in that Capitol.  He knew the vast majority of people in there were to overrun the police, that those numbers were there to take the Capitol under their control and to stop the certification of the election, to stop our democracy.

Likewise, comments that he made to others after the fact, giving false information about whether or not there was violence and who caused that violence, those comments, ironically, belie his public celebration that "The capital is ours!"

And then we also note that the defendant wore a body-worn

1    camera while he was in that building, and he --

2              THE COURT:  Ms. Nielsen, let me interrupt you for a

3    moment.  I have a question:  Has that camera footage ever been

4    found?

5              MS. NIELSEN:  No.

6              THE COURT:  Okay.

7              MS. NIELSEN:  It's never been found, Your Honor.

8    As I said, it appears that he was filming.  The way he holds --

9    in some of the footage from the surveillance video from the

10   Capitol, the way Mr. Mazzocco was holding the camera up, the

11   way he's angling it in certain directions.  Also, there are

12   times when you can see him from the back, and you can see that

13   viewfinder screen is lit up as if it's recording.

14        And, no, it has never been found.  Eleven days after this

15   incident, he was arrested.  The agents asked him where it was.

16   He said he didn't know.  And pursuant to the execution of the

17   search warrant on his home, it was never found, and the footage

18   has never been seen.

19        And I would note, Your Honor, that all of these things,

20   these factors, they all support a heightened need for specific

21   deterrence for Mr. Mazzocco specifically.

22        Finally , though, Your Honor, I would turn to factors

23   that do in fact weigh in his favor, and that's the history and

24   characteristics of Mr. Mazzocco personally.  He has no criminal

25   history to speak of.  He appears to be consistently and reliably

employed, supporting his family, and he has extended family support.

And in making our sentencing recommendation, Your Honor, we place substantial weight on his early acceptance of responsibility.  Within days of his arrest, Ms. Ward was contacting me and letting me know that he wanted to resolve the matter.

I would note, he was one of the first 10 to accept responsibility, first 10 of the Capitol January 6th defendants to accept responsibility.  And we hope, we hope, that this early acceptance of responsibility shows a desire not to engage in further criminal conduct and to in fact rehabilitate himself.  And we think that these factors allow the Court to tailor a sentence that is not as punitive for purposes of deterring this specific defendant.

We also acknowledge, of course, that this early acceptance of responsibility saves the government vast resources, which the United States Sentencing Guidelines specifically note as important when giving credit for early acceptance of responsibility.

And as this Court is aware, the January 6 case -- in this case and the January 6 cases themselves, that is no small matter.  We have stated now in multiple pleadings the investigation and prosecution of these offenses arising from the Capitol riot is one of the most involved, complex, and

resource-intensive investigations and prosecutions in American

history.

     The early resolution of this case and acceptance of

responsibility speaks well to Mr. Mazzocco, and we believe

that suggests a more lenient sentence is appropriate.  And for

those reasons, we are asking the Court to sentence Mr. Mazzocco

to three months of home confinement, three years of probation,

at least 60 hours of community services, and $500 restitution.

     And unless the Court has any other questions for the

government?

          THE COURT:  No.  Thank you, Ms. Nielsen.

          MS. NIELSEN:  Thank you.

          THE COURT:  Ms. Ward?

          MS. WARD:  Your Honor, Mr. Mazzocco is extremely

nervous.  He did write a letter that he asked me to read to

the Court on his behalf because he felt like it would be

overwhelming for him to speak to you today.

     He wrote:  "First, I need to apologize to the Court, to

the United States government, to my family, and the people of

Washington, D.C.  I never in my wildest dreams thought that I

would find myself writing this type of letter.  I'm writing you

this letter as I'm certain that I will be very nervous on my

sentencing date, and I want to correctly articulate my thoughts

and feelings to you.

     "My decision to enter into the Capitol was one of the most

foolish and impulsive decisions I've made in my life.  It was out of curiosity, and I had no intentions of harming anyone by doing so.  After my return and arrest, I watched the videos of the violence that occurred towards the police that day, and I was horrified.

"I support the police [indiscernible] a couple of officers inside.  Since that day, I've lived with a feeling of shame, sorrow, and remorse, not because I'm going through legal troubles, but because I'm seeing the country that I love so dearly divided like never before, and I took part in something that has certainly played a humongous role in contributing to that.

"Additionally, I've caused my family and dear friends worry and brought shame into my home and to my family's name. I've received countless death threats, threatening phone calls, harassing phone calls, and letters mailed to my home.  It's taken a huge toll on my wife and my children.  If I could go back in time, I certainly would not have even considered traveling to D.C.

"I am truly sorry for my actions and understand the significance of the choice that I made.  I can assure you that you will not see me getting into trouble again in the future. I've learned a lot during the course of the last nine months and have focused my efforts on becoming a better father, husband, and professional.

1     "I pray as a nation we can heal and move forward and that

2     I can contribute to that by continuing to be a productive member

3     of society and allowing my choices of the past to forge a better

4     version of myself.  I hope that you find it in your heart to

5     offer leniency in your sentencing.  Thank you for taking the

6     time to listen to my letter."

7         In applying the factors that the Court must consider,

8     Mr. Mazzocco is more remorseful than any person I think I've

9     ever represented, and this is a Class B misdemeanor.  I don't

10    say that lightly or mean to impress upon the Court that this

11    is not a significant case.  This is, frankly, the most important

12    case that I think I've handled this year in terms of what

13    happens to the people who have been charged.  But each person

14    should be sentenced according to the individual.

15        And Mr. Mazzocco is an individual who had no ill intent

16    in his heart and, frankly, told people that "the House is ours"

17    was before -- I believe the photo was before he went in.

18    The government was -- so it wasn't when he came out.  That was

19    before he went in, right or wrong, but it was not meant to

20    indicate he came out, oh, yes, we did it.  That was not correct.

21        Then the government says that he posted pictures of himself

22    while he was inside.  That's not part of the statement of facts

23    in our plea agreement.

24            THE COURT:  Well, let me stop you.  The statement

25    of facts simply sets forth the legal basis for the charges,

1    the factual basis for the legal charges against him.

2    It's not all-encompassing.  It's not meant to be exhaustive.

3    Are you disputing that he took those photographs?

4              MS. WARD:  No.  I'm not disputing that he took

5    photographs.  I'm not disputing that he was in the Capitol.

6    He's never disputed that.  I'm saying he didn't post pictures

7    of himself while inside.  That's the only distinction.  He

8    did post a picture of himself outside the Capitol, not inside.

9    Inside the video is not taken from him that you hear him telling

10   people, don't steal, don't trash anything, you need to treat

11   this -- act like you're in your own home, is what he says.

12        It wasn't at all that he's not taking responsibility.

13   He has done so, and I think that his early acceptance --

14   Ms. Nielsen is correct; he's had -- unfortunately, his house

15   was pictured on the news, and so he did fall into the category

16   of people who got all of -- letters and calls and pretty

17   frightening information, posts under the news stories about,

18   "We should storm this person's house.  It looks pretty nice."

19        And so he lost his job.  He is working on gaining

20   employment again.  But the fallout was massive for him, as

21   well it should be for everyone who acted with such disregard

22   for democracy that day.  But Mr. Mazzocco is a defendant who,

23   unlike a lot of people who had ill intent and had broken,

24   stolen, assaulted, does not fall into that category.

25        And I appreciate the government acknowledging that

about him.  And he doesn't have any criminal history.  I
appreciate that they do place him apart from certain other
individuals and groups of people that were there that day.

I just think that Probation's recommendation of 18 months
and the government's recommendation of 60 hours of community
service, that combination for Mr. Mazzocco provides adequate
deterrence, respect for the law, and indicates to people who
in cases like this get a fine or -- well, frankly, a fine and
move along.  But we've had him on nine months of pretrial
supervision that he's had no violations of, he's followed all
of the rules, done everything the Court has asked him to do,
and he will continue to do that.

It was 12 minutes in a lifetime of a million minutes,
millions of minutes, in which he has been a good father, a
good husband, son, worker.  He's taken just loads and loads
and loads of supplies to Houston when there's hurricanes,
voluntarily.  So that really defines the kind of man he is,
Your Honor, and he wants to continue to be able to be a good
role model.

THE COURT:  All right.

Did you have anything else, Ms. Ward?

MS. WARD:  No, Your Honor.

THE COURT:  Thank you.

Mr. Mazzocco, I listened to the letter that you wrote
that your lawyer read.  Is there anything you wish to say

1   at this time before I sentence you?  You don't have to, but

2   this is your opportunity if you wish to say something.

3             THE DEFENDANT:  I know that oftentimes, when people

4   find themselves in trouble, they'll say whatever they can to try

5   to get themselves out of trouble.  And I would just like you to

6   know that the letter that I wrote you was sincere.  It was from

7   the bottom of my heart.

8        And I am truly sorry for my actions that day, and it has

9   really taken a toll on me.  And I'm not saying that because I

10  want to get off.  I know that I made a big mistake and I cannot

11  undo that, and I just would like to apologize to the country,

12  to you, and to everyone that's been affected by this, the police

13  officers that day.  I just -- I'm very sorry.

14            THE COURT:  Thank you, Mr. Mazzocco.

15       Sentencing is difficult for this Court, and I think

16  I speak for many of my colleagues, as a general matter.

17  The Court tries always to balance all the factors that it must

18  consider in sentencing, bearing in mind the admonition that the

19  sentence imposed should be sufficient but not greater than

20  necessary to comply with the purposes of sentencing.

21       These purposes include the need for the sentence to reflect

22  the seriousness of the offense, to promote respect for the law,

23  and to provide for just punishment.  The sentence should also

24  deter criminal conduct, protect the public from future crimes

25  by the defendant, and promote rehabilitation.

1        In addition to the guidelines and policy statements,

2   I must also consider the nature and circumstances of the

3   offense, the history and characteristics of the defendant,

4   the types of sentences available, the need to avoid sentence

5   disparity, and the need to or provide restitution.  And I've

6   considered all these factors at length in preparation for this

7   sentencing.

8        These cases arising out of the riots of the Capitol on

9   January 6 are particularly difficult because, although many of

10  the defendants like Mr. Mazzocco were charged with and pleaded

11  guilty to misdemeanors, the Court, like many others in this

12  district, does not view the crimes that were committed on that

13  day as anything petty.

14       Many of my colleagues have spoken eloquently -- and

15  now I'm going to talk about the nature and circumstances of

16  the offense.  Many of my fellow judges have spoken out about

17  the gravity of the violent riot that took place on January 6.

18  I add my voice to theirs.

19       What happened on that day was nothing less than the

20  attempt of a violent mob to prevent the orderly and peaceful

21  certification of an election as part of the transition of power

22  from one administration to the next, something that has happened

23  with regularity over the history of this country.  That mob was

24  trying to overthrow the government.

25       They erected hangman's scaffolding.  They broke down doors

and barriers.  They destroyed property in Congress.  They fought law enforcement, who were outnumbered that day, resulting in the injury and death of police officers.  They broke down doors and barriers.  They paced the hallways, calling out and searching for the Speaker of the House and the Vice President, and one can only surmise what they were going to do with them had they found them.  They soiled and defaced the halls of the Capitol and showed their contempt for the rule of law.

That was no mere protest.  And even though Mr. Mazzocco was not fighting with the officers, even though he was telling people not to steal stuff, he was inside and his presence was part of the mob.  A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers, one of whom was Mr. Mazzocco.

Now, there are some people who have compared the riots of January 6 with other protests that took place throughout the country over the past year and who have suggested that the Capitol rioters are somehow being treated unfairly.  I flatly disagree.

People gathered all over the country last year to protest the violent murder by the police of an unarmed man.  Some of those protesters became violent.  But to compare the actions of people protesting, mostly peacefully, for civil rights, to those of a violent mob seeking to overthrow the lawfully elected government is a false equivalency and ignores a very real danger

that the January 6 riot posed to the foundation of our
democracy.

The actions that took place on January 6 were watched
with horror, not just by citizens of the District of Columbia,
who were terrified, but citizens of the United States, people
living in this country, and people all over the world who look
to this country as an example of the rule of law.

In this Court's opinion, the treatment has been far more
lenient than other defendants who regularly appear in our
courts.  To start with, the majority of the rioters, including
Mr. Mazzocco, were allowed to leave the scene of their crime,
unarrested and unharmed, and return to their homes, where,
once they realized the trouble they were in, they immediately
commenced -- he immediately commenced to conceal, destroy, or
minimize his participation in his wrongdoing.

Then Mr. Mazzocco, like hundreds of others who participated
in the riots, was charged with petty misdemeanors, despite his
deliberate, premeditated decision to come to the District to
try and stop the transfer of power.

And once he was charged, Mr. Mazzocco was released and
allowed to remain in his home, to be with his family, to
continue to work or look for work, and go about his daily life
because of the COVID pandemic.  He has never even had to come to
this court to answer for his crimes.  And, finally, although he
was charged with four counts, Mr. Mazzocco was allowed to plead

to one count and now stands before this Court seeking probation.

Now, this Court -- courts play no role in charging decisions or in plea negotiations, and we shouldn't.  That's not our role.  That is the role of the government, of the prosecutors; and they have done their job in this case, and they continue to work to investigate and prosecute the people involved in those riots.  They decide what charges to bring and what plea offers to make, and they've done so in this case. But it is my responsibility now to fashion what I believe to be a just sentence, taking into account, as I must in every case, all the purposes of sentencing.

I've already spoken about how serious a crime this was, that Mr. Mazzocco did not break down any doors or attack law enforcement.  That in fact he warned others not to steal or break anything does not mean his actions weren't serious. I received letters in support of Mr. Mazzocco in which they said he acted on impulse and went into the Capitol out of curiosity and to stand up for our country.  Ms. Ward said that today - impulsive actions and out of curiosity - and I took note of that.

But that was not the case, in this Court's opinion. Mr. Mazzocco was not walking by the Capitol and saw the hubbub and wandered inside to see what was going on.  That's impulsive.  That's curiosity.  That's not what he did. He learned about the protests, he bought an airplane ticket

from Texas, he paid for a ticket, he got on a plane with the
intent of coming to Washington to interfere with the transition
of power, to interfere with the certification of the election,
and that is what he did.

He got to the Capitol, and seeing the disorder and the
chaos and people scaling the walls of the Capitol and breaking
down barriers, having seen that, he then decides to go inside.
And maybe he didn't break a window to get inside, and maybe he
didn't injure any law enforcement in making his way inside, but
he made a conscious decision to go inside the Capitol, to wander
around, take pictures of himself -- grinning, as if the chaos
that was swirling around him was entertainment -- to stay in
the Capitol, and then finally to leave.

And once he got home, he didn't immediately realize the
wrongfulness of his actions.  He bragged about it.  When he
was at the Capitol, he said, "The capital is ours!"  Not
"The Capitol is the People's."  "The capital is ours!"

Mr. Mazzocco did not go to the United States Capitol
out of any love or support for our country.  He went there to
support one man who he viewed had the election taken from him.
In total disregard of a lawfully conducted election, he went
to the Capitol in support of one man, not in support of our
country or in support of democracy.

He stayed in the Capitol for 12 minutes, and granted, he
did not destroy any property, and he admonished people not to.

1    But he didn't have to go inside.  He didn't have to stay inside.

2    He didn't have to take those pictures.  And when he got home,

3    he was proud of what he had done.

4        It wasn't until the consequences of Mr. Mazzocco's

5    actions became apparent to him that he started to walk it back.

6    He deleted his social media accounts.  He told people that

7    there wasn't really a riot, that the violence was caused by

8    antifa -- a flat-out attempt to deflect blame onto individuals

9    and organizations that weren't even there -- and to diminish

10   the seriousness of his actions.

11       The evidence indicates that he was wearing a body-worn

12   camera, and yet he told law enforcement that he didn't know

13   where that camera footage was.  And it's never been found.

14   That camera footage would have shown exactly where Mr. Mazzocco

15   went and what he did, but we don't have that footage which was

16   in Mr. Mazzocco's possession when he left Washington, D.C.  That

17   was a coverup, or at least a partial coverup, of his actions.

18       And I take into account the government's statement and

19   Ms. Ward's statement that he accepted early responsibility.

20   But Mr. Mazzocco's remorse -- and I believe his remorse is

21   sincere -- Mr. Mazzocco's remorse didn't come when he left

22   that Capitol.  It didn't come when he went home.  It came when

23   he realized he was in trouble.

24       It came when he realized that large numbers of Americans

25   and people worldwide were horrified at what happened that day.

It came when he realized that he could go to jail for what
he did.  And that is when he felt remorse, and that is when
he took responsibility for his actions.

Ms. Nielsen spoke about deterrence, and so did Ms. Ward.
And that weighs heavily on this Court, because the country is
watching to see what the consequences are for something that
has not ever happened in the history of this country before,
for actions and crimes that threaten to undermine the rule of
law and our democracy.  And Mr. Mazzocco is far less culpable
than many other people who took part in those riots, but he is
culpable.  He went inside.  He stayed inside.   He was proud
of what he did.

I understand that Mr. Mazzocco is a beloved family member,
and I'm discussing now the characteristics of the defendant.
He is a much-loved father, son, brother, family member, member
of the community, friend.  I've received letters from many
members of this community, clergy.

He's a devoted member of his church, and he has taken
lots of actions to help in his community.  And that speaks well
to him.  I commend him for being that person, and I believe he
will continue to be that person.  The numerous letters that
I received attest to that, and those letters indicate the
esteem in which he's held by many, and he's to be commended.

But I'm a former public defender, and I am well aware
that people are complicated.  Good people can do bad things.

I've had many defendants charged with crimes just as serious as this violent crime, crimes that would horrify us all, who were loved sons, brothers, fathers, and members of the community. Many of them did not have the benefit of the strong family background and the resources that Mr. Mazzocco had.

It is to Mr. Mazzocco's credit that so many people hold him in such high esteem. But the fact is that none of that made any difference to his decision to come the District of Columbia on January 6 and support a mob who was intent on violence.

With regard to the types of sentences available, I do have a recommendation for home confinement from the government, a request for probation, and an option to sentence Mr. Mazzocco to up to six months in prison. I have to find a balance in those options. I also have to consider the need to provide restitution to the victims of the offense, and Mr. Mazzocco has agreed to pay a $500 of restitution as part of his plea agreement.

In terms of sentence disparities, it is difficult to compare sentences, because the January 6 riots are unique. And certainly in terms of -- this is not, as I said before, the average petty misdemeanor, and I'm aware of what my colleagues have been giving as sentences. But I am aware, as Ms. Ward said, that each defendant is an individual and their actions are theirs, and different defendants took different actions and

have been sentenced accordingly.  So the factor of avoiding unwarranted sentence disparities is neutral in this Court's estimation.

It is this Court's belief that a sentence of probation does not reflect the seriousness of the crime, promote respect for the law or provide for just punishment in this case, nor would it afford adequate deterrence to protect the public from future crimes.  If Mr. Mazzocco walks away with probation and a slap on the wrist, that's not going to deter anyone from trying what he did again.  It does not, in this Court's opinion, indicate the severity, the gravity, of the offenses that he committed on January 6.

And Mr. Mazzocco does not appear to be in need of educational or vocational treatment or medical care.

I cannot see how a sentence of probation would comport with the factors that I must consider, nor do I agree with the government that confining him to his home where he can be with his family for three months would be appropriate, and that is basically what he's been doing since his arrest.

And I commend him for complying with his conditions of release, but there have to be consequences.  There have to be consequences for participating in an attempted violent overthrow of the government beyond sitting at home, and in this case, I believe a brief sentence of incarceration is warranted in light of all the sentencing factors.

1    Having considered all of these factors, the Court

2  believes a sentence of 45 days of incarceration and 60 months

3  of community service, with a $500 restitution payment, is the

4  appropriate sentence in this case, and it is sufficient but not

5  greater than necessary to reflect the seriousness of the instant

6  offense, to promote deterrence, to protect the public from

7  future crimes that may be committed by the defendant, and to

8  avoid unwarranted disparity.

9    Therefore, based on my consideration of all the § 3553(a)

10  factors, I'll now state the sentence to be imposed:

11    It is the judgment of this Court that you, Matthew Carl

12  Mazzocco, are hereby sentenced to serve 45 days' incarceration

13  and, after that incarceration is complete, to perform 60 hours

14  of community service, to pay a $10 special assessment, and

15  $500 in restitution.

16    Given the restitution payment and the fact that

17  Mr. Mazzocco has lost his job, the Court will not impose a

18  fine.  The special assessment is immediately payable to the

19  Clerk of the Court for the U.S. District Court of the District

20  of Columbia.  Within 30 days of any change of address, you

21  shall notify the Clerk of the Court of the change until such

22  time as the financial obligation is paid in full.

23    You must complete 60 hours of community service.

24  The probation office will supervise your participation in the

25  program by approving the program.  You must provide written

1    verification of completed hours to the probation office.

2        Ms. Ward, Mr. Mazzocco will be allowed to turn himself

3    in for his sentence of incarceration as coordinated by the

4    probation office, which will inform him of when he needs to

5    report.

6        Mr. Mazzocco, pursuant to 18 U.S.C. § 3742, you have a

7    right to appeal the sentence imposed by this Court subject to

8    certain rights of appeal that you waived as part of your plea

9    agreement.  If you choose to appeal, you must file an appeal

10   within 14 days after the Court enters judgment.  If you are

11   unable to afford the cost of an appeal, you may request

12   permission from the Court to file an appeal without cost to you.

13       As set forth in the plea agreement, the government moved

14   to dismiss the remaining counts against Mr. Mazzocco.

15       Ms. Nielsen, does the government wish to do so now?

16           MS. NIELSEN:  Yes, Your Honor.  At this time we would

17   move this Court to dismiss counts 1, 2, and 3 of the

18   information.

19           THE COURT:  That motion will be granted.

20       Are there any objections to the sentence not already on

21   the record or anything else that we should address today?

22           MS. NIELSEN:  Nothing from the government, Your Honor.

23           PROBATION OFFICER:  Your Honor, Kelli Willett on

24   behalf of the probation office.

25           THE COURT:  Yes.

1          PROBATION OFFICER:  I do have a clarification for

2   Your Honor.  Your Honor did not impose a term of probation

3   that I heard.  Is that correct?

4          THE COURT:  No, I did not.

5          PROBATION OFFICER:  Okay.

6          THE COURT:  Frankly, you know, Mr. Mazzocco I believe

7   has learned his lesson.  I believe the sentence of incarceration

8   I've given him is sufficiently severe to punish him for what he

9   did, and I don't think it is a good use of our resources, which

10  are taxed to the maximum, to have him under further probationary

11  supervision.

12         PROBATION OFFICER:  I agree, Your Honor.

13         THE COURT:  So I'm not going to do that.

14         PROBATION OFFICER:  But my question is that the

15  Court asked the probation office to monitor his community

16  service terms.

17         THE COURT:  Oh, that's right.  And he can only do

18  that if he's under the supervision of Probation.  All right.

19     I'm imposing the 60 hours of community service, and,

20  Mr. Mazzocco, you should provide verification of that completion

21  of community service to your lawyer, who will file it with the

22  Court.

23         PROBATION OFFICER:  Thank you, Your Honor.

24         THE COURT:  You're welcome.  Thank you for pointing

25  that out, Ms. Willett.

1     Mr. Mazzocco, I say this frequently when I sentence

2  individuals, and I mean it, and I mean it in your case.

3  A very thoughtful man, Bryan Stevenson, who wrote a book called

4  *Just Mercy* that I highly recommend, said that we are not the

5  worst thing we have ever been done.  And I believe it, and I

6  believe it in your case.

7     You have lived an exemplary life in many respects.  You

8  are admired and looked up to and loved.  A lot of people who

9  come before me don't have the family love and resources and

10  support to fall back on which you do.  This is a part of your

11  life, but you have the rest of your life to show your children

12  and to show your family that people can do wrong things; they

13  can I make mistakes.

14     It is what they do afterwards.  It's how you fix those

15  mistakes.  It's how you conduct your life after those mistakes

16  that show character and show what you've made of.  And I believe

17  you have the ability, and I believe you're committed to making

18  right what you did and to living a productive life; and I hope

19  you do, and I wish you good luck in those future endeavors.

20     Is there anything further?  All right.  We're adjourned.

21     (Proceedings adjourned at 11:04 a.m.)

22

23

24

25

CERTIFICATE *

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


_____
BRYAN A. WAYNE

* PLEASE NOTE:

This hearing was taken via videoconference in compliance with U.S. District Court Standing Order(s) during the COVID-19 pandemic.  Transcript accuracy may be affected by limitations associated with use of electronic technology including but not limited to signal strength, background noise, or any other sound distortions.